Laura Denvir Stith, Judge
I concur in the principal opinion’s holding that section 537.125, RSMo 2000 permits a merchant to detain a suspected shoplifter “in a reasonable manner and for a reasonable length of time for the purpose of investigating whether there has been a wrongful taking of such merchandise or money,” § 537.125.2, and “in order that recovery of such merchandise may be effected,” § 537.125.3. Such reasonable detention will not subject the merchant to the risk of suit for unlawful arrest or detention. Id. But this does not answer the key questions in this appeal — what is “a reasonable manner” and “a reasonable length of time” for a merchant to detain a person?
Ms. Barkley would have this Court hold that continued detention is per se unreasonable once the store employee reacquires the merchandise from the suspected shoplifter. She argues, at that point, the *844 “purpose of investigating whether there has been a wrongful taking of such merchandise” has been completed and “recovery of such merchandise” has “been effected.” §§ 537.125.2, .3.
I agree with the principal opinion that this argument ignores subsection 4 of sec- • tion 537.125. The latter states in relevant part that a merchant “who has detained such person and investigated such wrongful taking, may contact law enforcement officers and instigate criminal proceedings against such person” without risk of being liable for malicious prosecution or other criminal or civil liability. I agree with the principal opinion that, read together, subsections 2, 3, and 4 permit the merchant to detain the suspected shoplifter after the merchandise has been reacquired if the purpose of the continued detention is further investigation or contacting law enforcement officers and awaiting their arrival for the instigation of criminal proceedings.
I differ from the principal opinion as to what constitutes a “reasonable manner” of detention, however. In particular, the statute, as just quoted, only authorizes use of “reasonable means” of detention for the purpose of investigating the allegedly wrongful taking and while awaiting law enforcement authorities. , The principal opinion, by contrast, affirms a verdict based on an instruction that permitted the use of physical force when Ms. Barkley failed to follow the store employees’ instructions and when she attempted to flee the store’s security office. That instruction did not require the jury to find that such physical force was necessary to recover the merchandise or to detain her at the store while waiting for authorities to arrive. In light of Ms. Barkley’s testimony that she simply wanted to go tell her husband where she was and what was going on, and in light of the irrelevance of obedience of employee instructions to any of these statutory issues, this distinction could have been dispositive.
Because of the errors in the submission of these affirmative defenses,'I would reverse and remand for a new trial under instructions properly submitting the affirmative defenses authorized by section 537.125.
More specifically, as the principal opinion correctly notes, Ms. Barkley was detained by two security employees at Price Chopper after they saw her fail to pay for some items she had placed in one of the reusable cloth bags she carried with her as she shopped. Although the principal opinion uses the term “concealed” in the cloth bag, thereby suggesting that she put the items in the bag to steal them, the jury acquitted her of shoplifting. In light of that verdict, a more appropriate term would be that the items were “placed” in the cloth bag.[1]
After Ms. Barkley was acquitted of shoplifting, she sued Price Chopper on multiple theories including the theories of false imprisonment and battery. In support of these claims, she testified at the trial that she was diabetic, disabled, and on pain medication, and carried her medications with her when she went with her husband and granddaughters to buy groceries at Price Chopper. She says she went with one granddaughter to look for *845 diabetes test strips while her husband took the cart and other granddaughters and collected groceries. As she shopped separately with the grandchild, she said, she picked up a few items and put them in the red cloth bag (her husband having the cart) and just forgot about them at checkout.
As shown on a videotape of the 46-minute detention,[2] once Ms. Barkley was brought into the security office, the employees emptied everything out of her purse to examine it (presumably for stolen property) and took her driver’s license for identification. For reasons not explained in the record, they looked at her prescription containers and then left them on the counter when they replaced her other items and moved her purse and shopping bags over to the top of a cabinet near where she was sitting. The security employees determined that the value of the items found in the shopping bag was sufficiently high that they called law enforcement. While everyone waited for the police, the employees filled out paperwork, Ms. Barkley took her cell phone out of her pocket to call her husband to let him know where she was and what was going on. One of the employees grabbed her phone from her and put it on the counter, where she could not use or reach it. She testified that she twice asked the employees to contact her husband. They refused and asked her questions for the paperwork. At this point, Ms. Barkley’s identity was not in question — the employees had her purse, her cell phone, her prescription medicines, her driver’s license, and had mostly filled out the paperwork with information about the incident. After waiting about two minutes, Ms. Barkley got up from the bench and walked over to where the employees were standing by the counter. She says she did so because of concern about her medications still being on the counter rather than back in her purse and to ask again about contacting her husband, but the employees said they did not hear what she said and just saw she had come up to stand next to them. They immediately grabbed her and handcuffed her, she claims while one stated, “I didn’t tell you to get up off the f — ing bench” and called her a “druggie” and repeatedly used profanity. She says the employees refused her request that they contact her husband who was sitting outside with the grandchildren.
At this point, as noted by the principal opinion, Ms. Barkley tried to reach the door to the office — she says to let her husband know what was going on — the employees say so she could flee — and she was grabbed, her legs knocked out from under her, and her handcuffs were moved so that her arms were handcuffed behind her rather than in front of her. She was left sitting on her legs on the floor for a long period, before the employees finally helped her up and to walk back to the bench, where she sat down and the employees removed the handcuffs. She remained on the bench until a policewoman arrived.
Ms. Barkley ultimately submitted her case to the jury on the theories of false imprisonment and battery. Ms. Barkley attempted to submit her battery claim without a tail referring the jury to an instruction submitting the store’s affirmative defense of reasonable detention. As noted above, I agree with the principal opinion that the trial court properly ruled that section 537.125 does codify a merchant’s privilege to detain a suspect for a reasonable time and in a reasonable manner, and that the store was entitled to submit an affirmative defense based on the *846 statute. I disagree, however, that the affirmative defense submitted was the one authorized by the statute.
Ms. Barkley’s verdict director submitted that “defendant intentionally pulled plaintiffs arms behind her back, handcuffed her, knocked her to the floor and pulled her to a sitting position as her arms were handcuffed behind her back.” Ms. Barkley’s counsel argues on appeal that the first pulling her arms behind her back and handcuffing her occurred when she first got up from the bench, and the knocking her to the floor and pulling her to a sitting position and handcuffing her behind her back occurred after she tried to open the office door, and that the submitted affirmative defenses would not make any of this conduct privileged. I agree.
Section 537.125, gives a merchant a privilege to “detain such person in a reasonable manner and for a reasonable length of time for the purpose of investigating whether there has been a wrongful taking of such merchandise or money” and so that the merchant “may contact law enforcement officers and instigate criminal proceedings.”
This is not the affirmative defense submitted by Price Chopper in its affirmative defense instruction, however. Because there is no form M.A.I. for submitting such an affirmative defense, Price Chopper modified M.A.I. 32.10, titled “Battery Actions — Resisting Invasion of Property.” M.A.I. 32.10 is as follows:
Your verdict must be for defendant if you believe:
First, plaintiff attempted to (here describe unlawful act such as “enter defendant’s home’’ or “take defendant’s property”) when plaintiff had no right to do so, and
Second, defendant (here describe defensive measures such as “s truck plaintiff”) for the purpose of resisting plaintiffs attempt, and
Third, defendant used only such force as was reasonable and necessary to prevent plaintiff from (here repeat act described in Paragraph First).
This format could not be exactly followed here, because if it were, Price Chopper’s instruction would have to submit in paragraph second that it used force to resist the taking of its property and in paragraph third that it used only such force as was necessary. to prevent that taking. As Price Chopper already had recovered the property before it used any force, this would not do. So it instead needed to submit why it was authorized to continue to hold Ms. Barkley after it recovered its merchandise, even though it already had her identifying information. That authorization comes from section 537.125, which creates a very specific basis on which a merchant may continue to detain the suspect without risk of suit — the merchant must have reasonable grounds to believe there has been a wrongful taking and the continued detention must be for the purpose of investigating whether there had been a wrongful taking or to wait for the arrival of law enforcement.
To apply section 537.125 correctly, therefore, MAI 32.10 had to be modified so that it instructed the jury that it should find for defendant if it found that defendant had reasonable grounds to believe there was a wrongful taking and that it continued to detain plaintiff for a reasonable time and in a reasonable manner in order to investigate whether there had been a wrongful taking or to await law enforcement. In other words, unlike in the example given in MAI 32.10, it is not the allegedly wrongful taking that justified the use of force; rather, it is the desire to continue investigating and await law enforcement.
*847 One way MAI 32.10 could have been modified to accomplish this purpose that would have been in- accordance with section 537.125 would have been to add an additional paragraph, so that the instruction would read something like the following:
Your verdict must be for defendant if you believe:
First, plaintiff attempted to take defendant’s property when plaintiff had no right to do so, and
Second, defendant intentionally pulled plaintiffs arms behind her back, handcuffed her, knocked her to the floor and pulled her to a sitting position as her arms were handcuffed behind her back, and
Third, defendant did so for the purpose of investigating whether there had been a wrongful taking of its property or to detain plaintiff until law enforcement officers arrived, and
Fourth, defendant used only such force as was reasonable and necessary to investigate whether there had been a wrongful taking of its property or to detain plaintiff until law enforcement arrived.
Instead, Price Chopper modified MAI 32.10 so it instructed that the jury should find for defendant if it found that plaintiff did not follow its employee’s instructions and attempted to flee its security office, stating:
“First, plaintiff Deborah Barkley either refused to follow defendant’s loss prevention officers’ instructions or attempted to flee the loss prevention office, and
Second, defendant’s loss prevention officers handcuffed and leg swept plaintiff for the purpose of resisting plaintiffs attempt to flee the loss prevention office, and
Third, defendant’s loss prevention officers used only such force as was reasonable and necessary to prevent plaintiff from fleeing the loss prevention office.”
Defendant’s instruction was erroneous. It told the jury that Ms. Barkley’s wrongful conduct was not the taking of property from Price Chopper without paying for it but failing to follow defendant’s loss prevention officers’ instructions and attempting to flee the loss prevention office. It told the jury that if the officers handcuffed and leg swept her to keep her from fleeing that office or because she failed to follow instructions, then the jury had to find for defendant. It nowhere explained how the failure to follow instructions was relevant to its defense but simply posited that it was wrongful and somehow connected.
These submissions are not authorized by section 537.125. Refusing to follow defendant’s employees’ instructions is not the same as refusing to await law enforcement. Trying to leave a security office is not the same as refusing to await the arrival of law enforcement. And neither of these two acts is the unlawful act that justified the detention — that unlawful act, the one that should have been submitted, was the taking of items without paying for them, and the jury should have been required to find that this wrongful taking occurred before it could consider the alleged privilege.
This distinction is key to liability, for section 537.125’s defenses only apply for the purpose of reacquiring the merchandise and investigating and holding the person for law enforcement. Those means may not be used merely to make a person follow employee instructions or not leave the security office. And as the employees already knew who Ms. Barkley was and had her purse, ID, and medications, she was not fleeing to avoid identification. Had the jury been properly instructed that force was reasonable only if used to inves *848 tigate or to hold her for law enforcement, it might well have found that the force was not used in a reasonable manner when it was used because she failed to follow instructions and tried to leave the office to talk with her husband.
The principal opinion says that even if the instruction were incorrect in submitting these defenses, it is simply a matter of incorrect wording and Ms. Barkley did not object to the wording of the instruction. But, the problem with the instruction is not the particular words used but the very concept that failing to follow instructions or leaving the security office are submissi-ble as affirmative defenses at all. Counsel for Ms. Barkley did adequately make this objection at the instruction. conference, stating:
[Ms. Barkley’s counsel]: We object to the giving of Instruction 9 in its present form with the tail referring to the affirmative defense submitted by defendant because that defense submits inapplicable and inappropriate defenses to plaintiffs battery claim. It misstates the law with respect to plaintiffs battery claim and the law with respect to defenses to battery. Further, we object because it is not supported by the evidence and misleads the jury as to the law and the evidence.
[[Image here]]
[The Court]: Moving on to instruction No. 10 submitted by the defendant, is there an objection to this instruction? [Ms. Barkley’s Counsel]: Yes, Judge, I object to it for the same reasons that I stated with respect to Instruction 9.
.... [Ms. Barkley arguing distinction of case cited by counsel for defendant]
... and the facts in this case don’t warrant or justify the submission of this instruction in this case.
While the principal opinion is correct that this objection certainly is not a model, it specifically raises the issue that defendant’s affirmative defense instruction “misstates the law with respect to plaintiffs battery claim and the law with respect to defenses to battery.” This was minimally adequate under Rule 84.13 to preserve counsel’s point on appeal that the affirmative defense instruction did not submit an authorized defense and is not authorized by section 537.125. The objection further was adequate to preserve Ms. Barkley’s additional objection that Instruction 10 submitted facts that were not supported by the evidence — specifically that the instruction submitted that Ms. Barkley was handcuffed to prevent her from fleeing whereas she notes it is undisputed that only the second handcuffing allegedly was for that purpose and that the first was because she “failed to follow instructions” of Price Chopper’s security officers.[3] Counsel was not required to tell the court how Price Chopper could improve the instruction by removing the reference to employee instructions and making the flight defense apply only to the second battery and modifying it to clarify that Ms. Barkley’s intent had to be to flee before police arrived, not just to leave the security office.
Finally, Ms. Barkley’s Point II in the court of appeals did directly and specifically raise the impropriety of submitting “fleeing the loss prevention office” as an excuse for the batteries that occurred pri- or to her attempt to open the door to the security office.[4] This was adequate to pre *849 serve that issue under any application of Rule 83.08.
For these reasons, I would remand for a new trial at which both parties should more carefully follow the statute in preparing the jury instructions.

. "Conceal” is defined as, "[t]o keep from being seen, found, observed, or discovered; hide.' ’ Tub American Heritage Dictionary of the English Language 381 (4th ed. 2006). Other definitions include "to prevent disclosure or recognition of,” "avoid revelation of,” "refrain from revealing,” "withhold knowledge of,” "draw attention from,” "treat so as to be unnoticed,” "to place out of sight,” "withdraw from being observed,” and "shield from vision or notice.” Webster’s Third New Int’l Dictionary 469 (1993).

. The videotape has no sound.

. Contrary to the principal opinion's statement, instructions 9 and 10 clearly submit both batteries, which is why there are two references to handcuffing plaintiff rather than just a single reference.

. Point II said that Instruction 10 was improper because:
*849 it was not supported by competent and substantial evidence in that Instruction No. 10 hypothesized that all of the batteries inflicted upon plaintiff were inflicted after and as a result of her alleged attempt to flee the loss prevention office when in fact the evidence showed that numerous batteries were inflicted upon her before the alleged attempt to flee the loss prevention office.